DAIRYMEN'S LEAGUE COOPERATIVE
ASS'N, Inc. v. BRANNAN, Secretary
of Agriculture.

No. 36, Docket 21009.

United States Court of Appeals
Second Circuit.

Feb. 1, 1949.

58

Seward A. Miller, of New York City, (Frederic P. Lee, of Washington, D. C., and Frank B. Lent, of New York City, of counsel), for appellant.

Neil Brooks, Sp. Asst. to Atty. Gen. (J. Stephen Doyle, Jr., Sp. Asst. to Atty. Gen., Lewis A. Sigler, Asst. Assoc. Sol., U. S. Dept. of Agriculture, of Washington, D. C., and Irving J. Higbee, U. S. Atty., and Edmund Port, Asst. U. S. Atty., both of Syracuse, N. Y., on the brief), for appellee.

Before L. HAND, Chief Judge, and SWAN and CHASE, Circuit Judges.

## L. HAND, Chief Judge.

The Dairymen's League appeals from a judgment which dismissed its complaint in an action to review an order of the Secretary of Agriculture, which had for the most part denied its petition filed under § 8c (15) (A) of the Act, 7 U.S.C.A. § 608c (15) (A), for a refund of sums paid to the "producer-settlement fund." [1] The petition was referred to a "judicial officer," who held a hearing and on March 8, 1946, made an extensive and detailed report which has been published.[2] The findings of fact incorporated into the report are too voluminous and detailed to be repeated here; and, since our decision will be primarily of interest to those who are concerned with the administration of milk regulation in the Metropolitan Marketing Area,[3] we may proceed in our discussion upon the assumption of an acquaintance with the findings. The defendant's brief contains at its end a graphic chart of the plaintiff's four claims, which in small compass makes clear the controlling facts, and this we append hereto: it will, we believe, make intelligible what we have to say, or at least serve as a skeleton to which such facts as are necessary may be added.

During the two periods in question (October 1, 1938, to February 1, 1939, and July 1, 1939, to April 30, 1940) the plaintiff had two plants, one at Horseheads, New York, the other at Mansfield, Pennsylvania, which we shall speak of as its "country plants." Both were outside the "marketing area," which comprised only the City of New York and the Counties of Westchester, Nassau and Suffolk. To these plants "producers"—farmers—delivered part of the milk which is in question in Claims One and Two; the rest of this milk was delivered to the "country plants" by "feeder" plants which had received it from other "producers." Nearly all the milk in question in Claims Three and Four was delivered to the Borden Company by "producers," who were members of the plaintiff, or by the plaintiff's "feeders." The case turns upon how all this milk should be "classified" under the Regulation, of which we set out in the margin those parts that are controlling.[4]

---

[1] § 927.8 (g) of the Code of Federal Regulations, 1938 Supplement.

[2] 5 Decisions of the Secretary of Agriculture 143.

[3] Part 927, Chapter IX, Title 7, Code of Federal Regulations, 1938 Supplement.

[4] 927.2 (f) of the Code of Federal Regulations, 1938 Supplement.

"'Handler' means any person who engages in the handling of milk, or cream therefrom, which was received at a plant approved by any health authority for the receiving of milk to be sold in the marketing area, which handling is in the current of interstate commerce or directly burdens, obstructs, or affects interstate commerce. This definition shall be deemed to include a cooperative association of producers with respect to any milk received from producers at any plant operated by such association or with respect to any milk which it causes to be delivered from producers to any other handler for the account of such association and for which such association collects payment. This definition shall not be deemed to include any person who neither receives milk from producers nor handles milk which is sold as milk or cream in the marketing area."

§ 927.4 of the Code of Federal Regulations, 1938 Supplement.

"*Classification of milk*—(a) *Basis of Classification.* All milk received from producers by handlers shall be classified in the classes set forth in paragraph (b) of this section in accordance with its utilization at, or movement from, the plant where received from producers, in-

### Claim One

The milk in question in Claim One, having been received either at Horseheads or Mansfield from "producers" or "feeders," was there turned into cream, and all sold, F.O.B. Newark, New Jersey, to the Philadelphia Dairy Products Company. That company had an "affiliate," called the Janssen Dairy Corporation, which had a "plant" in Hoboken. Newark was not in an "approved county"; but Hoboken was—Hudson County. The cream, though billed to, and paid for by, the Philadelphia Company, was "picked up" at the railway platform at Newark by the Janssen Company, and was taken by trucks to the Janssen Company's Hoboken plant, whence all of it went to three of that company's other buildings, except such part as was sold to one, Decker, in Hudson County. One of the three buildings was in Bergen County—"unapproved"; the other two were in Hudson County.

The question is whether this cream was properly classified under subdivision (b) of § 927.4 as II-A, or should have been classified as III-D. The defendant argues, and the "judicial officer" found, that III-D (except for the concluding clause covering "cream cheese") was limited to cream sold from the first of the two plants covered by the second proviso of subdivision (a). The argument is that, since the body of subdivision (a) makes classification depend upon "utilization at" the first "plant," or "movement from" it, in contrast with both provisos which make "utilization at" the second "plant" the only basis of classification, some distinction must be presupposed, and classification at the second "plant" can never depend upon the milk's "movement from" it. There is much to be said for this; but the difficulty is that subdivision (b), which defines "classes of utilization," speaks throughout (except in the first

cluding members of any cooperative association; *Provided,* That if milk is moved as milk from any plant outside the marketing area where received from producers to a second plant outside the the marketing area, classification of such milk at the first plant may be in accordance with its utilization at such second plant; *And provided further,* That if milk is moved as cream, plain condensed milk or homogenized mixtures from any plant outside the marketing area to any second plant classification of such milk at the first plant may be in accordance with its utilization at such second plant.

"(b) *Classes of utilization.* The classes of utilization of milk shall be as follows:

"(1) Class I milk shall be all milk which leaves a plant as milk, chocolate milk, or any whole milk drink, and all milk the utilization of which is not established for classification in some other class named in this section, except that loss or waste of milk in the plant where received from producers, not to exceed 2 percent of the total quantity of milk received from producers, may be pro-rated to each class in the proportion which the milk in such class is of the total quantity of milk classified.

"(2) Class II-A milk shall be all milk the butterfat from which leaves or is on hand at a plant in the form of cream, except as set forth in subparagraphs (5) and (7) of this paragraph.

"(3) Class II-B milk shall be all milk the butterfat from which leaves, or is on hand at a plant in the form of plain condensed milk, except as set forth in sub-

paragraph (6) of this paragraph, frozen desserts, and homogenized mixtures.

"(4) Class III-A milk shall be all milk the butterfat from which leaves or is on hand at a plant in the form of evaporated milk in hermetically-sealed cans, sweetened condensed milk, milk chocolate, milk powder, malted milk powder, or any cheese other than American Cheddar and cream cheese.

"(5) Class III-B milk shall be all milk the butterfat from which leaves or is on hand at a plant in the form of cream which is subsequently held in a licensed cold storage warehouse for more than seven days at a temperature below zero degrees Fahrenheit.

"(6) Class III-C milk shall be all milk the butterfat from which leaves a plant in the form of frozen desserts or homogenized mixtures which were sold outside of New York City.

"(7) Class III-D milk shall be all milk the butterfat from which is delivered as cream to a purchaser, not a handler, outside the State of New York and outside any county in other States in which there is a plant which is approved by any health authority for the receiving of milk to be sold in the marketing area, also milk the butterfat from which leaves or is on hand at a plant in the form of cream cheese.

"(8) Class IV-A milk shall be all milk the butterfat from which leaves or is on hand at a plant in the form of butter.

"(9) Class IV-B milk shall be all milk the butterfat from which leaves or is on hand at a plant in the form of American Cheddar cheese."

phrase of III-D itself) of the form in which the produce "leaves" a "plant" ; and, therefore, incorporates the factor of "movement from" a "plant." The question is a vexed one and we shall leave it undecided, accepting the plaintiff's argument, for the purposes of this appeal, that it had an option of classifying the cream at either the first or the second "plant."

Coming then to the cream in Claim One, we shall first consider its proper classification at the two "country plants." Concededly, it was within II-A, unless it could be brought within III-D: that is, unless it was delivered to a "purchaser" who was "not a handler." We shall start by assuming with the plaintiff that the milk which the "feeders" delivered to the two "country plants" is to be classified like that delivered by "producers"—that is, that the "feeders" shall not count as a first "plant." The record leaves uncertain just what was the relation between the Philadelphia Company and the Janssen Company; all it says is that the second corporation was an "affiliate," which may mean that the corporations should be treated as a single jural person, or as two. We shall consider Claim One on both hypotheses.

If we treat the corporations as several, the cream was never "delivered" to the Philadelphia Company at all; the Janssen Company took it directly from the platform of the carrier, a bailee, and carried it by truck to the Hoboken "plant." The plaintiff does not suggest that the Philadelphia Company was not the "purchaser," and it necessarily follows that upon this hypothesis III-D was not available at the two "country plants." If, on the other hand, we treat the Philadelphia Company and the Janssen Company as one, when the Janssen Company "picked up" the cream from the carrier's platform in Newark, although the delivery was to the "purchaser," the Philadelphia company was also a "handler," by virtue of the ownership by the Janssen Company of that company's Hoboken "plant," which was in an "approved county." This is quite another question than whether a person who has a "plant" in an "approved county" and another "plant" in an "unapproved county" is to be regarded as a "handler" as to milk which he receives in the "unapproved county." All we need hold as to Claim One is that when a "purchaser" receives cream in an "unapproved county" and takes it at once to a "plant" in an "approved county," his status as "handler" of that milk is to be determined by the location of that "plant."

What we have said disposes of the classification of the cream at the two "country plants"; it remains to consider its classification at the Janssen Company's Hoboken "plant." So much of the cream as was delivered from the Hoboken "plant" to other "plants" of the Janssen Company whether in Hudson County—an "approved county"—or in Bergen County—an "unapproved"—was not delivered to a "purchaser." We will state the justification for this conclusion in our discussion of Claim Two, where the question also arises. The only "purchaser" from the Hoboken "plant" was Decker, who was a "sub-dealer" in Hoboken; but since the "delivery" was in an "approved county," III-D did not cover it. Claim One was properly dismissed.

### Claim Two

The milk involved in this claim was also delivered by "producers" and "feeders" to the plaintiff's two "country plants" where it was made into cream. From the two "country plants" it went to a plant of the plaintiff in Newark in an "unapproved county," whence part of it was sold to the Janssen Company, and was taken to one of its "plants" in Bergen County, an "unapproved county." The remainder was sold to dealers or "sub-dealers," who did their business, so far as appears, in "approved counties." Some of this cream was sold at the "plant" in Newark, some was shipped by express collect, and some was delivered "on route" by the plaintiff's trucks.

The plaintiff first argues that its delivery to its Newark "plant" was a purchase, for which it relies upon a remark of Reed, J., in United States v. Rock Royal Co-Operative, Inc.[5] that "purchased" means "acquired for marketing." That was said in discussing sales of milk by "producers" to their coöperative, as to which the Act was explicit; it was not intended as a gen-

---

5 307 U.S. 533, 59 S.Ct. 993, 1016, 83 L.Ed. 1446.

eral definition, and to use it in interpreting III-D would unduly expand the court's meaning. Class III-D was probably put into the Regulation because it was supposed that cream actually bought by someone outside an "approved county" was unlikely to find its way into the "marketing area." Since the first "plant" was the two "country plants" and there was no sale from them, we need consider only the proper classification at the plaintiff's Newark "plant." As to the cream sold to the Janssen Company and taken by it to its own "plant" in Bergen County, since the company was a "purchaser" and the delivery was in an "unapproved county," the question whether the cream was within III-D depends upon whether the "purchaser" was a "handler." That, in turn, depends upon whether its ownership of the Hoboken "plant" in an "approved county" made it a "handler" as to cream delivered at its "plant" in the "unapproved county," or whether its character as "handler" should be determined by the location of the "plant" at which the cream was "delivered." The defendant argues that unless the phrase, "not a handler," in III-D means, "not a handler anywhere," it is a redundant interpolation, which we should not assume. His reason for this is that by definition [6] a "handler" is one who handles milk or cream "which was received at a plant approved by any health authority for the receiving of milk to be sold in the marketing area"; and that a person who handles milk or cream, only at a "plant" in an "unapproved county," would not come within that definition, even without the addition of the phrase, "not a handler." Hence, to give the phrase any significance whatever, it must mean that the "purchaser" is not a "handler" elsewhere; which results in saying that he must not have a "plant" in any "approved county." To this the plaintiff answers that, if the phrase, "not a handler," were left out, a New York City dealer might bring himself within III-D by buying cream in an "unapproved county" and taking it to sell in New York; and that it was necessary to provide that he must not himself be a handler to prevent this. However, we cannot believe that, if III-D had not contained the phrase, it would have been susceptible to such easy evasion as this argument presupposes. It would be true that "delivery" would in that case have been made in an "unapproved county," if by "delivery" no more was intended than the transfer of possession to the "purchaser"; but that, we submit, is not a tenable reading. We have already so decided in discussing Claim One as to the delivery of cream to the Janssen Company on the railroad platform at Newark, which it carried by truck to its Hoboken "plant." In the plaintiff's example of the New York City dealer the applicability of III-D (if the phrase were left out) would depend upon whether the "purchaser" took delivery at the seller's "plant," or the seller delivered at the "purchaser's" "plant"; and to make that circumstance determinative would introduce a factor altogether alien to the general purposes of the Act. Since the Janssen Company had a "plant" in an "approved county," the cream delivered to it at its Bergen County "plant" was delivered to a "handler," and was not within III-D.

■ The cream sold to the dealers and sub-dealers from the Newark "plant" was in part delivered to them in Newark and in part "on routes" or by express. The only remaining question as to these is whether they were "handlers"; but in view of what we have said as to "delivery" this is not important. So far as appears, all had their place of business in "an approved county," and the "delivery" was in that county, regardless of whether they took possession at the plaintiff's platform in Newark, or received the cream where they did business. Claim Two was properly dismissed.

### Claims Three and Four

These claims we shall break into Claim "A" and Claim "B" and "C," since that is a more convenient division. Claim "A" was for milk delivered by "producers" or "feeders" to four "plants" of the Borden Company, and to two small "plants" of the plaintiff. That delivered to the first Borden "plant"—the Belmont "plant"—was there made into cream and delivered to a second Borden "plant" at Newark; that delivered to the other three Borden "plants"—Brisben, Pine Bush and Deposit—and to the

---

[6] § 927.2 (f).

two small "plants" of the plaintiff, was delivered as milk to the Borden "plant" at Newark, where some of it was made into cream and mixed with that which had come as cream to the Newark "plant" from the Belmont "plant." What remained of this milk does not concern us. All the cream, both that made at Newark and that delivered there as cream, was then shipped to the Borden "plant" at Paterson in an "approved county," whence it was sold in ways not material.

█ The Belmont "plant" was operated by the Borden's Manufacturing Products Division of the Borden Company, and until October 1, 1939, the other "plants" were operated by the Borden Farm Products Division of that company. We assume, since there is nothing to the contrary in the record, that these "Divisions" did not represent separate jural persons, but only a convenient distribution of operative management. From October 1, 1939 forward, all the Borden "plants" here involved, except the Belmont, were operated by a new corporation then organized—Borden Farm Products of New Jersey, Inc. Whether these "plants" were transferred to the new company and what was the relation between it and the main Borden Company, is not clear; we shall assume for argument that it was an independent corporation, and that after October 1, 1939, the cream which passed from the Belmont "plant" to the Newark "plant" was sold.

█ We take first the milk which came to the Belmont "plant" and which was there made into cream and delivered as such to the Newark "plant." At the Belmont "plant" it was properly classified as II-A unless it was within III-D. Until October 1, 1939, it could not have been classified as III-D, because the Newark "plant" was not a "purchaser," for reasons which we have already given in discussing Claim Two. After October 1, 1939, even though we consider the transfer as delivery to a purchaser, the cream was nevertheless not within III-D because the Borden Company which owned the Newark "plant," was a "handler" by virtue of its ownership of other "plants". Nor could the cream be otherwise classified at the Newark "plant" itself, because the "delivery" was not to a "purchaser," and because it would have been to a "handler," if the Paterson "plant" had been a "purchaser." Taking next the milk which came to the Brisben, Pine Bush and Deposit "plants," it could not properly be classified otherwise than as I-A at those "plants," for it left them as milk, and only cream comes within III-D. Nor could it be classified as III-D at the Newark Borden "plant," because, although it was there made into cream, it was not delivered to a "purchaser," and if it had been, the "purchaser" was a "handler." Finally, taking the milk delivered to the plaintiff's small "plants," it could properly be classified only as I-A at those plants, because, although delivered to a "purchaser," it was not in the form of cream. At the Newark "plant," though made into cream, it could not be classified as III-D for the reasons already given in the case of the other cream delivered to the Paterson "plant."

█ The plaintiff invokes a "memorandum" of Harmon, the Administrator at the time, made on December 8, 1938, which declared that "when milk is diverted from a strictly fluid receiving station to a separating station, and from there on to a manufacturing plant, the manufacturing plant * * * is the second plant where the product moved as cream." Assuming this to be a proper interpretation, it does not apply here, because the Paterson "plant" was not a "manufacturing plant," but only a distributing plant. Part "A" of Claims Three and Four was, therefore, properly dismissed.

█ Parts "B" and "C" of Claims Three and Four concerned milk, all of which was delivered after October 1, 1939, by "producers" or "feeders" to a Borden "plant" at Oxford, there made into cream and transferred to another Borden "plant" at Washingtonville in an "approved county." Thence it was transferred to four other Borden "plants," three of which were in "unapproved counties," and one in an "approved county." If we reckon the Oxford "plant" as the first, the cream as it left for the Washingtonville "plant" did not go to a "purchaser" : hence it was not within III-D. If classified at the Washingtonville "plant," it was not within III-D because it was not delivered to a "purchaser." Parts

"B" and "C" of Claims Three and Four were also properly dismissed.

## Miscellaneous Questions

The plaintiff makes several arguments which it thinks militate against the interpretations which we have adopted. The first is that the cause went to trial upon a stipulation which contained the following passages. "The delivery of cream shipped to such plant was not a receipt or purchase by a handler." This language was used of the plaintiff's Newark "plant" in Claim Two. The other passage is: "the operator with respect to such a plant is not a handler, and cream shipped to such a plant would be in the first instance delivered to a purchaser in an unapproved county who was not a handler with respect to such plant." This language was used of the plaintiff Borden's Newark "plant," in Part "A" of Claims Three and Four. If the plaintiff had been misled in presenting any evidence in reliance upon this stipulation, we might feel obliged either to send the case back for further hearing, or perhaps even hold the defendant to the stipulations; but it does not ask leave to prove any other facts than those on which the cause was heard; nor could it have been misled in the conduct of its business, because the stipulation was signed long after all the transactions here in question. Apparently, the conclusiveness of this agreed definition of the word, "handler," was first questioned by the "judicial officer" at a hearing on July 20, 1945. He at that time "warned" both parties that he might not feel bound by "legal conclusions as to whether a person is a handler." A discussion followed, but all that we can find is a request by the plaintiff to be allowed "to submit briefs on that point," if the "judicial officer" decided not to accept the stipulation. Although the plaintiff complains that no leave was ever given to file such a brief, we cannot see, in view of the opportunity for argument afforded both in the district court and here, that this is a grievance to be considered. The "judicial officer" was entirely right in not accepting the stipulation as final. It at-tempted to put a gloss upon the Regulation and the Regulation had the force of law. The duty of courts is to administer rights and obligations as they exist, not as the parties may choose to substitute others.[7] Provided fair opportunity be given to meet any change of front which arises out of the repudiation of the agreed interpretation, the party who suffers from it has no ground for complaint; and the doctrine is especially reasonable when, as here, the repudiation is by a succeeding official who differs with his predecessor.

The plaintiff goes further, however, and asserts that there had been earlier interpretations in its favor, judicial and administrative, which we ought to follow. In Vogt's Dairies, Inc. v. Wickard[8] Judge Mandelbaum held that, for the purpose of obtaining a credit in the "producer-settlement fund," a "handler" should not be considered such as to transactions in an "unapproved plant." Whether this decision was meant to extend to classification under III-D might be debated; but, if it was, we cannot assent for the reasons we have given. As an administrative interpretation, the plaintiff invokes another "memorandum" which Harmon issued in December, 1938, in which he ruled that "when a plant is not approved for the marketing area the dealer is not considered a handler at that plant." This was issued only a few months after the Regulation itself was promulgated, and at a time when, in the nature of things, interpretation was tentative, or, if it was not, ought to have been. We are indeed aware how great an advantage familiarity with the multifarious ramifications of such a subject as milk regulation gives to administrators, and how much less favored are we who must plunge into it unequipped. Nevertheless, we should have to endow them with almost supernatural powers, if they were not, like ourselves, at the outset stunned and confounded by the fantastic proliferation which emerges, when one attempts to find a path through such verbal mazes. We are satisfied that the second thought of the Administrator was better

---

[7] Swift & Co. v. Hocking Valley Ry. Co., 243 U.S. 281, 289, 37 S.Ct. 287, 61 L.Ed. 722; Estate of Sanford v. Com'r, 308 U.S. 39, 41, 60 S.Ct. 51, 84 L.Ed. 20; Cloverleaf Co. v. Patterson, 315 U.S. 148, 151, 152, 62 S.Ct. 491, 86 L.Ed. 754.

[8] D.C., 45 F.Supp. 94.

than his first; and we do not feel bound to accept the early ruling.

The plaintiff asserts in its brief that it relied upon the "memorandum" of December, 1938, which defined "not a handler," and that, because of it, it conducted its business as it would not otherwise have done. This it calls an "estoppel." It is true that in cases of doubtful interpretation, long usage in reliance upon an administrative interpretation often counts for much.[9] We need not say how far we should feel bound by the interpretation if the plaintiff had proved that it did conduct its business in reliance upon the "memorandum" during the period in question. Be that as it may, there is not a syllable of such evidence in the record, although, as we have said, the "judicial officer" gave ample warning of what might be his eventual ruling. Nor did the plaintiff ask to be allowed to put in such proof, even after the report was filed. We cannot accept as an equivalent the bare assertion in the brief; nor would it be just now to send the cause back to try out an issue which would presumably lead far afield.

Next the plaintiff complains of the exclusion of an exhibit which was designed to show, and which, we may assume, did show, the facts necessary to determine "the Class II-A (unpriced) cream price and * * * comparable prices between such prices in the New Jersey markets" after the Regulation went into effect. The object of this was, and could only be, to prove that the Regulation did not operate as it was designed to do, and that, as construed, it was unreasonable. It is, of course true that when alternative interpretations are possible, the more reasonable of the two is to be chosen; but the test of what is reasonable must be based upon what was before the draughtsmen of the Regulation, for their intent is a past fact, not determined or determinable by future events. Such evidence could not possibly have any bearing upon its meaning; it would only show that the purpose sought to be realized was not in fact realized; and purpose and realization are totally different things. The plaintiff does indeed suggest, but only in an indirect way, that, if construed as we are construing it, the Regulation is invalid. Plainly, we are in no position to decide that question. The Regulation was the result of long investigation and deliberation; and the evidence on which it was based is not before us. As upon the issue that it acted upon the faith of the Harmon "memorandum," the plaintiff had its opportunity to challenge the validity of the Regulation. It preferred not to try out that question, when that course was open. It would be to the last degree unjust, now that it has failed, to reopen the proceeding and go through a long consideration of issues, many of which have in any event been superseded by the amendment of 1940. The regulation of an industry such as this—indeed of any modern industry—is an undertaking of monstrous difficulty; it yet remains to be seen whether success is within the compass of human abilities. Those charged with such duties must proceed as best they can, correcting their initial blunders, as experience teaches; some ineptitudes and some injustices are inevitable at the start; they are the price of the undertaking as a whole.

Finally, the plaintiff complains that the administration of the Regulation has been unequal and inconsistent; not, as we understand, because it was deliberately partial, but because it has been wayward and vacilating. The plaintiff cannot, however, become the vicarious champion in its own interest of imperfections in the discharge of the Secretary's duties. If he has correctly interpreted his powers in dealing with it, and imposed upon it no greater obligations than were lawful, it is no answer that others have fared better; any more than when burdens have been unequally imposed by the mistakes of courts of law.

Judgment affirmed.

---

[9] California v. Deseret Water, Oil & Irrigation Company, 243 U.S. 415, 421, 37 S.Ct. 394, 61 L.Ed. 821.

Appendix

Claim No. 2

First cream plant

Second cream plant

Third cream plants

Feeder plant → Milk → League plant Horseheads, N. Y., separated into cream

Prod. → Milk →

Feeder plant → Milk → League plant Mansfield, Pa., separated into cream

Prod. → Milk →

Cream →

Oct.—Nov. 1939 League plant Newark, N. J. Essex Co. (unapproved)

Cream packaged Dec. 1939

Calstadt distributing bldg., Bergen County (unapproved)

On route—Oshacker, sub-dealer, Passaic Co. (app.) II–A unpriced

Sold on platform at Newark to Holfrick, sub-dealer Hudson Co. (app.) II–A unpriced

Sold from Newark, express, collect to dealers as Woodbrook Farm in approved County II–A unpriced

Trucked to 257 Ocean Ave, Jersey City, Hudson Co. (app.) II–A unpriced

Trucked to Jefferson St, Hoboken, Hudson County II–A unpriced

Grand St, Hoboken plant, Hudson County (app.) II–A unpriced

On route—Hudson Rest. Hudson Co. (app.)

Sold on platform to Richardson, sub-dealer Hudson Co. (app.)

On route—Lackawanna Rest. Hudson Co. (app.)

On route—Meyer Store Bergen Co. (unapp.)

On route—Mrykytke, sub-dealer, Hudson Co. (app.)

Sold on platform to Decker, sub-dealer Hudson Co,, (app.)

Claim Nos. 3 & 4, "A"

First cream plant    Second cream plant    Third cream plants

Feeder Plant —Milk→ Borden plant Belmont, N. Y. / Separated into cream

Prod. —Milk→ (Belmont plant)

Belmont plant —Cream→ Borden plant Newark, N. J. / Essex Co. (unapproved) (unapproved plant) / Some separated into cream and commingled and packaged with cream shipped from Belmont plant*

Prod. —Milk→ Borden plants Pine Bush & Brisben, N. Y. —Milk→ Newark plant

Prod. —Milk→ Borden plant Deposit, N. Y. —Milk→ Newark plant

Prod. —Milk→ League plants Little York and Sherburne, N. Y. —Milk→ Newark plant

Newark plant → Borden distributing building Paterson, N. J., Passaic Co. (approved)   II-A (unpriced)

→ On route—Pops Rest. Passaic Co. (app.)

→ On route—Home Bakery Bergen Co. (unapp.)

*None of this milk was reclassified by the market Administrator in November 1939.

Claim Nos. 3 & 4, "B" & "C"

**Feeder plant** → Milk

**Prod.** → Milk

First cream plant

Borden plant Oxford, N. Y.

Separated into raw cream

Second cream plant

Borden plant Washingtonville, N. Y. (approved co.) unapproved plant

Cream pasteurized and bottled

II-A (unpriced)

"B" →

Third cream plant

Borden distributing building Montclair, Essex Co., (unapp.)

→ On route—Andersacks Conf. Essex Co. (unapp.)

"C"

Borden distributing bldg. Paterson, Passaic Co. (app.)

→ On route—Pops. Rest. Passaic Co. (app.)

→ On route—Home Bakery Bergen Co. (unapp.)

Borden plant Newark, Essex Co. (unapp.)

→ On route—Clifton Lunch Newark, Essex Co. (unapp.)

→ On route—Madora—Patton Rest. Elizabeth, Union Co. (app.)

Borden distributing bldg. Hackensack, Bergen Co. (unapp.)

→ On route—German Noble Drug, Bergen Co. (unapp.)