**WEISSGLASS GOLD SEAL DAIRY COR-
PORATION et al., Plaintiffs,**

v.

**Earl L. BUTZ, Secretary of Agriculture
of the United States of America,
Defendant.**

**73 Civ. 2464 (MP).**

United States District Court,
S. D. New York.

Dec. 20, 1973.

La Berteau & McLaughlin, New
York City, Gold, Gold, Morland & Pit-
tore, Flemington, N. J., for plaintiffs, by
Michael Gold, Flemington, N. J., of coun-
sel.

Paul J. Curran, U. S. Atty., S.D.N.Y.,
by V. Pamela Davis, New York City, of
counsel.

## OPINION

POLLACK, District Judge.

This action is brought pursuant to 7 U.S.C. § 608c(15)(B) for judicial review of an administrative ruling of a Judicial Officer of the United States Department of Agriculture. The parties have made cross-motions for summary judgment; there are no issues of material fact in dispute.

Plaintiffs are engaged in the business of receiving, handling, processing, selling and distributing milk in the New York-New Jersey Milk Marketing area. That area is regulated by the defendant Secretary of Agriculture Earl Butz through the office of the "Market Administrator of Order No. 2", described more fully below.

The decision of the Judicial Officer, complained of herein, in substance upheld a determination by the Market Administrator that plaintiffs had inadequately priced, in effect, certain milk which had been in inventory at the end of June 1968, by reporting for it a price classification which was lower than the class of its actual use by the handlers. This resulted in a payment by them to a market-wide settlement fund of an amount less than the price payable for actual utilization of the product in question. Plaintiffs were ordered to pay the indicated deficiency into that fund and seek now to recover the differential paid. The claims total approximately $85,-000.00.

### Background of the Controversy

The milk industry has long been regulated by an extensive and complicated network of statutes emanating from the Agricultural Marketing Act of 1937, 7 U.S.C. § 601 et seq. Milk marketing orders issued under the Act provide for the classification of milk in accordance with the form in which or the purpose for which it is *used*, and for the payment to all producers delivering milk to all handlers under a particular order of uniform minimum or "blend" prices for all milk delivered.[1] A thorough examination of the regulatory scheme is not necessary for present purposes.[2]

Pursuant to the Act, the Secretary of Agriculture issued an "order"—"Order No. 2"—under which the Market Administrator was given power to oversee the regulation and classification of milk, and to establish the "blend" price for the milk as required by the Act. It is the amendment of this "Order No. 2" that is at the core of this litigation.

The actual system of classification and pool-pricing under the "old" order, before the amendments, was fairly simple: at the end of each month, the handlers classified their milk in inventory according to certain classes, as outlined in the regulations. *See* 7 C.F.R. § 1002.37 (1968 ed.).[3] On the basis of this initial classification, the handlers paid fixed sums per hundredweight of milk into the marketwide pool for payment to the producers. The Market Administrator then had the power to adjust these classifications if the milk in inventory at the end of any month was in fact later put to a different class *use* than that reported by the handlers in their initial classification. For example, milk initially classified by the handlers as "Class II" milk would, if actually put to a "Class I" use, be reclassified by the Market Administrator as "Class I" milk. The initial classification might have reflected an anticipated use of lower or higher value than the ultimate actual use thereof by the handlers. The reclas-

---

1. For a more extensive description of the Act, its aims, and its purposes, *see* Queensboro Farm Products v. Wickard, 137 F.2d 969 (2d Cir. 1943).

2. The entire area of milk regulation has long puzzled the Courts in this Circuit and elsewhere. *See, e. g.,* Dairymen's League Cooperative Ass'n v. Brannan, 173 F.2d 57 (2d Cir. 1949) (L. Hand, Ch. J., "stunned and confounded" by the "verbal mazes" of the milk regulatory orders) ; Crowley's Milk Co. v. Brannan, 198 F.2d 861 (2d Cir. 1952).

3. For example, milk that was utilized for cheese was in a different class than milk utilized for cream.

sification by the Market Administrator according to actual use thus resulted in the handler paying either additional sums to, or receiving a refund from, the marketwide pool, depending upon whether the adjustment resulted in a determination that there initially had been either an underpayment or overpayment.[4] In June 1968, the basic class prices per hundredweight were as follows: Class I, $6.39; Class II, $4,773; Class III, $3.-978. The final result of the classifications with adjustments was to assure that each handler ultimately paid the producer for milk according to its actual use.[5]

In 1968, extensive amendments to the "order" were promulgated by the Secretary of Agriculture, and after a hearing duly held, the amendments were ratified and became effective July 1, 1968. The effect of the amendments was basically to change the classification system from a three-tier to a two-tier system; products formerly in Class III were placed in a new Class II, while a number of former Class II and Class III products were placed in Class I. Furthermore, a change was made in the method of classifying closing inventories from one allowing the handler to elect a tentative classification based on intended use (with final classification based on actual use) to one classifying inventory according to whether it is held at the end of the month in package or bulk form, with no later change in classification based upon actual use by the handler. However, the same objective of the "old" order—i. e., classifying milk in accordance with the form of its actual utilization—

is nonetheless generally achieved under the "new" order, through provisions for a system of allocation set forth in the "new" order. See 7 C.F.R. § 1002.-45(a)(7), (1969 ed.). Section 8c(5)(A) of the Act (7 U.S.C. § 608c(5)(A)) expressly provides that pricing shall be based on the use of milk, and the "new" Order fully complies with that mandate.

In shifting the classes of product, the amendments necessitated a one-month transitional period so that inventory on hand at the end of June 1968 would be classified compatibly with the "new" Order; accordingly, a transitional formula was devised to facilitate the switch in systems. Although complex almost to the point of mystification, nothing in any administrative or authoritative explanation of the intent and effect of the transitional formula and the manner of its application contradicts the meaning and the interpretation thereof given to it by the agency, viz., that utilization of the product became the ultimate criterion of price payable therefor.

Plaintiffs contend that the amendments to Order No. 2 allowed them to make their initial classification of the milk on hand on June 30, 1968 the final classification thereof and the basis on which they were to be charged for their June closing inventory, i. e., as Class II, and that they were privileged to dispose of this inventory in a use in July that was Class I (both under the "old" order's provisions) with no additional charge.[6] However, the Market Administrator, purporting to act under the "old" order, adjusted plaintiffs' initial June 30th classifications to reflect the actual

---

4. An alternative method of adjustment under the "old" Order No. 2 involved the addition of a "fluid skim differential" to the classification. 7 C.F.R. § 1002.43 (1968 ed.) The effect of this adjustment was the same as the reclassification system, namely, to assure that there would be a proper allocation of the amounts to be paid to the producers.

5. This method of pooling was discussed and approved by the Supreme Court in United States v. Rock Royal Cooperative, Inc., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939).

6. The position of one of the plaintiffs herein, Tuscan Dairy, differs somewhat from that of the others. Tuscan apparently did not recognize the supposed "loophole" in the amendments until after it had already classified it's June milk. Once awakened to the contention of the others, Tuscan communicated with the Market Administrator and attempted to downgrade it June 1968 inventory. The Market Administrator refused to allow the change, saying that there was no mistake in the initial classification that would merit the switch, and the Judicial Officer upheld the action of the Market Administrator.

use to which the milk was ultimately put. Some of the adjustments were made as soon as the reports were received, while others were made months later, after audits were completed, based on the form in which the milk was actually used in July by the handlers. Since the actual uses were in classes that called for higher payments than reported by the handlers, the Market Administrator ordered the handlers to pay the differential to the settlement fund. Plaintiffs protested the billing of the adjustments; they argued that the provision for the one-month transition period contained in the amendment expressly allowed them to make a final, non-reviewable classification of their milk in inventory at the end of June 1968, even if that milk would in fact later be put to a higher price-class use. Accordingly, on June 26, 1970, they filed a petition with the Department of Agriculture pursuant to 7 U.S.C. § 608c(15)(A), challenging the Market Administrator's actions. A hearing was held before an Administrative Law Judge, who filed a decision on January 23, 1973, concluding that the actions of the Market Administrator were proper and lawful, and that the petition should be dismissed. Reargument was denied on March 6, 1973. Pursuant to federal regulations (37 Fed.Reg. 28475; 38 Fed.Reg. 10795), the matter was then referred to the Judicial Officer for final decision. On May 15, 1973, the Judicial Officer filed a 73-page opinion affirming the previous decision, denying the relief requested and dismissing the petition. The nub of the ruling of the Judicial Officer is expressed in his conclusions as follows:

> [T]he classification and pricing provisions of the Order in effect prior to the July 1 amendments expressly applied to all milk *received* from producers during the month of June, irrespective of when it was utilized; and no change in those classification and pricing provisions *applicable to milk received in June* was made by the July 1, 1968, amendments. Hence the Mar-

ket Administrator had no choice but to apply all of the provisions of the "old" Order and regulations to the milk received in June. Under such provisions in effect in June, final classification could not be determined by the Market Administrator until the actual utilization of the milk in July.

### The Instant Proceeding

Pursuant to 7 U.S.C. § 608c(15)(B), this Court's jurisdiction is confined to examining whether the decision of the Judicial Officer was "in accordance with law." United States v. Mills, 315 F.2d 828 (4th Cir. 1963), cert. denied, Mills v. Freeman, 375 U.S. 819, 84 S.Ct. 57, 11 L.Ed.2d 54 (1963); Beatrice Creamery Co. v. Anderson, 75 F. Supp. 363 (D.Kan.1947). Accordingly, this Court's role is quite narrow; no *de novo* hearing can be held, nor may this Court draw its own independent inferences and conclusions from the record below. *See* Lewes Dairy, Inc. v. Freeman, 401 F.2d 308 (3d Cir. 1968), cert. denied, 394 U.S. 929, 89 S.Ct. 1187, 22 L.Ed.2d 455 (1969).

It is thus clear that the resolution of this case hinges on whether the amendments to Order No. 2 effective July 1, 1968, were interpreted within the applicable law and the regulations administered accordingly. The relevant portion of those amendments, describing the procedure to be used during the transition period between the "old" and "new" orders stated, in pertinent part:

> *Provided*, That for the first month of operation under this amended order such pounds of skim milk shall be subtracted from Class 1–A if classified as Class I–A, I–B, or II in the preceding month and from Class II if classified as Class III in the preceding month;
> · · .. 7 C.F.R. § 1002.45(a)(7).

The Judicial Officer's statement of the issue before him succinctly summed up the opposing contentions of the parties:

> If the word classified means the classification initially reported by the handler on his report, the form in

which the milk was actually used in July is immaterial, and the petitioners prevail. On the other hand, if the word "classified" in this section means the final classification as determined by the Market Administrator, then the petitioners will have to pay for their June inventory of milk (received from producers in June) in accordance with the form in which the milk was actually utilized in July, and the respondent prevails.

Therefore, it is for this Court to determine whether the Judicial Officer's decision, upholding the Market Administrator, was supported by substantial evidence.

That the decision below was supported by substantial evidence is clear beyond peradventure of doubt. Moreover, it is manifest that the plaintiffs' proposed interpretation of the transition period formula failed to give effect to the requirements of the Act and the Secretary's purpose to conform thereto by a chain of regulations to be read together. Plaintiffs necessarily concede that the classification procedure under both the "new" and the "old" orders provided for some sort of adjustment by the Market Administrator to insure uniformity of pricing and equality of allocation. But plaintiffs contend that a one-month interregnum was created in the transitional step from one method to the other. If that were so, it is contended that the Market Administrator was without power to close that "loophole" *ex post facto*.

■■■ The fact that a peculiar gap was created in the regulations would not in and of itself defeat plaintiffs' claim, even if it resulted in an unforeseen windfall to plaintiffs. Neither "loopholes" nor "windfalls" are judicial catch-phrases necessitating a finding of *per se* unreasonableness. See Menendez v. Saks & Co., 485 F.2d 1355 (2d Cir. 1973), at 1365. It is for the rulemakers and not the Courts to amend such provisions, if and as necessary. *Cf.* Lewyt Corp. v. Commissioner, 349 U.S. 237, 75 S.Ct. 736, 99 L.Ed. 1029 (1955). And it is undisputed that the Market Administrator cannot *sua sponte* change an order promulgated by the Secretary. See Dairymen's League Cooperative Ass'n v. Brannan, 173 F.2d 57 (2d Cir. 1949).

■■ Here, however, it can scarcely be said that plaintiffs' interpretation of the amendment was clearly either evident from the text or took account of all the relevant elements written into the regulations. At best the plaintiffs' reading is one conceivable, though strained, interpretation. In such circumstances, the law is clear that the more reasonable of two possible interpretations should be chosen by the Administrator and, *a fortiori*, by the Courts. Dairymen's League Cooperative Ass'n v. Brannan, *supra*. The Act itself mandates that milk should be classified "in accordance with the form in which or the purpose for which it is used," and prices should be fixed according to such "use classification." 7 U.S.C. § 608c(5)(A). Thus, the plaintiffs' reading of the amendments would, if nothing else, run counter to the expressed purposes and mandate of the Act. See also Windham Creamery, Inc. v. Freeman, 350 F.2d 978 (3d Cir. 1965), cert. denied, 382 U.S. 979, 86 S.Ct. 551, 15 L. Ed.2d 470 (1966); Waddington Milk Co. v. Wickard, 140 F.2d 97 (2d Cir. 1944). Furthermore, the word "classified", as used previously under the "old" order, had always referred to the adjusted classification ultimately set by the Market Administrator. See 7 C.F.R. § 1002.30 (1968 ed.). There is nothing to suggest that any different meaning should be ascribed to the same word used in similar context, merely because the time period involved was different. The Market Administrator's actions and the Judicial Officer's subsequent affirmance were consistent with long standing policy, practice, and the language of the Act keying classification to actual use of the milk product and prescribing uniformity. As such, the decision of the Judicial Officer was clearly "in accordance with law."

The plaintiffs' motion for summary judgment is denied and the defendant's cross motion for summary judgment is granted and the action is dismissed on the merits with costs to the defendant against the plaintiffs.

So ordered.