## WADDINGTON MILK CO., Inc., v. WICKARD, Secretary of Agriculture.

### No. 134.

Circuit Court of Appeals, Second Circuit.

Jan. 10, 1944.

Solomon I. Sklar, of New York City (Hays, Wolf, Schwabacher, Sklar & Epstein and Sydney C. Winton, all of New York City, on the brief), for plaintiff-appellant.

William L. Lynch, Asst. U. S. Atty., of New York City (James B. M. McNally, U. S. Atty., of New York City, on the brief), for defendant-appellee.

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This proceeding for a review of a ruling of the Secretary of Agriculture brings up another phase of the milk order, No. 27, 7 CFR, 1938 Supp., 927.1–927.11a, regulating the handling of milk in the New York metropolitan marketing area, under consideration in Queensboro Farms Products, Inc. v. Wickard, 2 Cir., 137 F.2d 969. In that case we held that the controlling provision as to milk of the Agricultural Marketing Agreement Act of 1937, amending and re-enacting the Agricultural Adjustment Act, § 8c(5), 7 U.S.C.A. § 608c (5), which requires milk orders to contain one or more of the following terms and conditions, and no others, "Classifying milk in accordance with the form in which or the purpose for which it is used" (and fixing minimum prices for each "such use classification" which all "handlers" or distributors must pay), in view of its objectives and of its legislative history, contemplated a classification according to the use made by or to the handlers, and not the ultimate use of the milk by or to the consumer. That conclusion, as we shall point out below, we think is controlling of the issues here. The order and the act had already been sustained against constitutional attack in United States v. Rock Royal Coop., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446.

Plaintiff is a handler with a milk plant at Waddington, New York, where it received milk which it manufactured into various milk and skim milk products. These were then either sold there or transmitted to another of plaintiff's plants, located in New York City, to be there sold and distributed. Plaintiff did not ship any fluid milk from its Waddington plant. During the months of July, October, November, and December, 1939, plaintiff separated some of the fluid milk received at its Waddington plant into cream and skim milk. From the skim milk plaintiff made buttermilk and, to improve the quality, added to it some of the cream which had been separated during the preceding few days. In its monthly report to the market administrator it reported the cream so added classified as Class II-A. But the administrator reclassified the milk equivalent of the cream so added in the higher Class I, making an increase in cost of ½c. per quart for July and 1c. for the other months, or a total additional charge against plaintiff of $1,142.55. Plaintiff then pursued its statutory review, 7 U.S.C.A. § 608c(15) (A), to the Secretary, who through the Assistant Secretary affirmed the administrator's action with formal findings, conclusion, and ruling to that effect. Plaintiff's action for review, brought in the district court within the time permitted by statute, 7 U.S.C.A. § 608c(15) (B), resulted in a decision by the district court sus-

taining the administrator's action and this appeal follows.

■ Plaintiff attacks first the interpretation put upon the order and second the validity of the order as interpreted. It says that under the order the cream made into buttermilk should have been classified as cream, not as buttermilk, and hence within the lower classification; or, if the cream is to take the higher classification, then the order itself is invalid, particularly because it does not comply with the statutory admonition of uniformity among handlers.

The first point turns upon the meaning of certain parts of Order No. 27, particularly §§ 1 and 2 of Article III, 7 CFR, 1938 Supp., 927.4(a, b). This article is entitled "Classification of milk," and its first section, "Basis of classification," states: "All milk received from producers by handlers shall be classified in the classes set forth in section 2 of this article in accordance with its utilization at, or movement from, the plant where received from producers, including members of any cooperative association," with provisos which state the so-called "second plant exception," covering movement of milk from a first to a second plant "outside the marketing area," not here involved (compare the Queensboro case, 137 F.2d at pages 973, 979–981). Then follow provisions for verification of the utilization claimed by a handler to be made by the market administrator, with audit of the handler's records. The final paragraph is: "Any milk or cream which is on hand at any plant at the end of any month shall be classified in accordance with the form in which it leaves, or is utilized at, such plant not later than the 8th day of the following month."

Section 2, "Classes of utilization," had nine classes at the time here involved.[1] Classes 1 and 2 are here important, viz.: "1. Class I milk shall be all milk which leaves a plant as milk, chocolate milk, or any whole milk drink, and all milk the utilization of which is not established for classification in some other class named in this section," except that loss or waste, not to exceed 2 per cent, may be prorated to each class in the proportion of milk in that class to the total classified. "2. Class II-A milk shall be all milk the butterfat from which leaves or is on hand at a plant in the form of cream," except that included in III-B (cream stored in a cold storage warehouse) and III-D (cream in substance going outside the New York area). Also to be noted is Article V, 7 CFR, 1938 Supp., 927.6, which provides for preliminary and final monthly reports by handlers to the market administrator. The final reports "with respect to milk received at each plant during the preceding month" must be made "on or before the 10th day of each month."[2]

Plaintiff's contention was that, since the milk products in question were "on hand" at its plant as cream at least for a day, it was entitled to this classification. The milk administrator, however, held this inapplicable and, considering that the cream took the form of buttermilk which was not otherwise specifically classified, concluded that it was covered by Class I as "all milk the utilization of which is not established for classification in some other class named in this section."

Unless the words "on hand" can be given the significance attributed to them by plaintiff, the conclusion of the administrator is clearly correct, for the cream then took the form of buttermilk which falls into the catchall provisions of Class I. But we agree with the considered view of the district court and of the administrative officials that "on hand" cannot mean any of the temporary forms which the milk product may have assumed while at the plant, but clearly refers to the form in which it is on hand at the end of the month, thus tying in directly with the other provisions for de-

---

[1] In 1940, another class was added, while in 1941 the classes were reduced to seven. 7 CFR, 1940 & 1941 Supps., 927.3(b).

[2] The classes themselves did not alone determine the payments to producers; by a quite complicated machinery there was first determined the obligation of the handler to an equalization pool, followed by the administrator's determination each month of a uniform price and later payment to the producer of such uniform price, with differentials, however, for "transportation and location" and for the butterfat content of the milk, including premiums for "Grade A milk." 7 CFR, 1938 Supp., 927.5,7,8; United States v. Rock Royal Co-op., 307 U.S. 533, 551–555, 571–573, 59 S.Ct. 993, 83 L.Ed. 1446. For present purposes it is perhaps sufficient to note the rather extraordinary diversity of conditions which the order attempts to meet and surmount.

termination of the use classification not later than the 8th, and final report by the 10th, of the following month. So interpreted the various parts of the order make a consistent and common-sense whole. Read distributively, however, this language conflicts directly with the provision as to milk products on hand at the end of the month. Further, the definition does not then appear sensible or complete. What reason is there, for example, why, if more or less momentary form is to govern, it should not be the highest, rather than the lowest, form attained by the product, particularly since the insertion of the catchall provision in Class I manifests an intent to prefer that form?

Plaintiff does, however, rely upon two further grounds to support its interpretation, of which one is a deduction from the fact that out of ten references to this matter in the nine different classes of utilization only seven of them contain the words "leaves or is on hand," the other three being in some different form, and the other is an argument based upon late amendments to the order. The first ground is hard to follow. Whatever the reason for the differences in language in the classification, we do not see the distinction plaintiff asserts between some "definite change of form" of the fluid milk into cream, cheese, or other products in the seven instances as differing from some lesser change, e. g., frozen dessert in the other three, or how such a distinction is made of any significance in the classes. The most we can get out of this is the implication that the language used was unprecise; but while we are not called upon to construe the other classes, we think there are understandable reasons for the differing language employed. Thus, Class I, with the catchall provision, does not require, and, indeed, might be made confusing by, the "on hand" provision, while the other classes omitting it, III-B and the first part of III-D, are carefully carved-out exceptions from

Classes II-A and II-B to allow lower rates for certain special and limited uses actually had outside of New York. As to the changes in the order made after the events here involved, they would have at most only a limited bearing on our problem; actually we think they tend rather to support the administrator's interpretation than otherwise.[3]

■ Agreeing, therefore, with this interpretation of the order, we turn to the issue of its validity. Here plaintiff relies particularly on a further provision of § 8c (5) (A) of the Act, which, after providing, as we have seen, for classification of milk "in accordance with the form in which or the purpose for which it is used," continues: "Such prices shall be uniform as to all handlers, subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers." Plaintiff says that it must pay more for its milk than another handler who performs the two operations here involved at different plants.

Obviously this section of the Act should be construed as a whole to give effect to the purpose for which classification is made. The provision as to uniformity should not control or vitiate the classification directed in the first sentence; the prices within the proper and authorized classifications should be uniform, rather than that uniformity of prices to handlers should be had, whatever has been the classification. This general intent of the section is emphasized by the specific adjustments expressly permitted, which include those for "locations at which * * * any use classification thereof, is made to such handlers." It is to be noted, also, that here the classification is made as of the receiving plant, i. e., discrimination, if any is between plants, not handlers. Plaintiff, if

---

[3] Plaintiff relies on a provision added in 1940 and 1941 to what was § 927.4(a), now § 927.3(a) (3), which puts the burden upon the handler to show that milk should not be classified as Class I milk, or, having established the manufacture of cream, to show that it should not be classified in II-A. This reasonable administrative presumption seems at most hardly to touch our present problem; in any event, it is subject to a more precise definition of Class II-A, which by 1940 included this provision, "unless such cream is established to have been subsequently so handled or marketed as to classify such milk in some other class" —apparently an express negation of plaintiff's contention, none the less so that in 1941 another amendment did include in this class milk drinks of less than 3% butterfat (i.e., the buttermilk here involved). Ibid. 927.3(b) (2).

operating two plants, would receive the same treatment as would the operators of two separately owned plants. Hence the real question is whether a classification dependent upon the use of the milk at the initial receiving plant of the handler is valid. This we think has been answered in the affirmative by the Queensboro case.

To appreciate the implications of this conclusion it is necessary to have in mind the problems confronting the Congress in passing the act and the Secretary in establishing the order. The need of regulation, as has so often been pointed out, was very great, but so were the difficulties. No simple and arbitrary classification of the milk to determine the form and manner of payment to be made by the distributors seemed adequate in view of the many different uses to which fluid milk could be devoted and its prime necessity as an article of diet, the alternate periods of glut and scarcity, so striking a feature of milk production, the requirements of quick marketing or else of expensive storage, and the many other problems of the business. See Hamilton, Price and Price Policies, 1938, 431–524; 46 Yale L.J. 1359; 42 Yale L.J. 1259. It therefore seemed desirable that certain differentiations based on the manner of utilization of the milk should be made. But there were obvious difficulties in making the ultimate consumer's utilization the test. Not the least of these was the fact that here was an Agricultural Adjustment Act, or frankly a regulative measure to improve marketing conditions not for the consumer, but for the producers, as the declaration of conditions, 7 U.S.C.A. § 601, stated; it was the impairment of "the purchasing power of farmers" and the destruction of the value of "agricultural assets which support the national credit structure" towards which the legislative attention was directed. But the producer had little direct interest in or control over the ultimate utilization of the milk and might well be prejudiced if his recompense were made to depend upon that utilization. Given the conditions and the purpose, there appears to be nothing unreasonable in selecting as the controlling point for determination of the form in which milk is to be classified for the fixing of wholesale prices the time when it leaves the initial receiving plant of the distributor. This gives the latter reasonable opportunity to determine an appropriate utilization of the milk without allowing him to await the more or less for-tuitous circumstances which may determine the final disposition of the milk to the ultimate consumer. Indeed, with modern methods of preserving and conserving milk in mind, the latter test appears quite impracticable. And this our decision in the Queensboro case rejected.

Once this point is determined, it seems clear that exceptions should be allowed only where they are at once necessary and reasonable; exceptions which tend to destroy the main point of classification itself would be unfortunate from the standpoint at once of fairness to the persons involved and of effective administrative regulation and supervision. Thus, to make an exception to a handler who had more than a single plant in favor of the form in which he made his final use would be undesirable; it would give an advantage to the bigger handler, it would make the classification depend upon the chance number of plants he had, and it would make administrative supervision of interplant changes well nigh impossible. Plaintiff's argument that the present order may force an uneconomic use of milk by inducing handlers to move it from plant to plant in an endeavor to obtain lower rates is not overpersuasive. Doubtless the theoretical possibility of obtaining such advantage may exist in almost any scheme of classification which may be devised. Practically the cost of extra handling is likely to prevent an uneconomic manipulation of milk between plants.

As a matter of fact, plaintiff's argument really tends to an opposite extreme, one where classification and price-fixing will rest upon whatever form the handler may have chosen for the product even temporarily. This renders administrative supervision quite impossible; it is claimed as necessary only because of what other handlers or even the same handler may do at separate plants. To press uniformity so far would, of course, defeat the very basis upon which this order was developed, namely, the choice of the definite form which the milk took at the initial receiving plant as determining the price. After all, it is the function of the Secretary, not of the courts, to devise a fair system of fixing marketing costs. Here he acted only after the most extensive hearings and consideration of the interests of all parties with the referendum required by the Act, United States v. Rock Royal Co-op., supra, 307 U.S. at pages 556–560, 59 S.Ct. 993, 83 L.Ed. 1446; and the later history of the

order shows that it has been under constant supervision and examination since its adoption. The order is complicated and detailed; certainly it appears more likely to achieve fairness in the greater number of cases than any we can think of or suggest. We are clear that it results in no unfair discrimination among handlers here. Indeed to an unusual degree, considering the complications of the industry, equality of opportunity to operate and of operation is preserved by it.

Judgment affirmed.