CROWLEY'S MILK CO. Inc. v. BRAN-NAN, Secretary of Agriculture.

No. 261, Docket 22284.

United States Court of Appeals Second Circuit.

Argued June 5, 1952.

Decided July 23, 1952.

862

Frank, Circuit Judge, dissented.

Neil Brooks, Sp. Asst. to Atty. Gen. (J. Stephen Doyle, Jr., Sp. Asst. to Atty. Gen., Donald A. Campbell, Atty., U. S. Dept. of Agriculture, of Washington, D. C., Julius C. Krause, Atty., U. S. Dept. of Agriculture, of New York City, and Edmund Port, U. S. Atty., Northern District of New York, of Syracuse, N. Y., on the brief), for defendant-appellant.

Sydney C. Winton, New York City (Hays, Wolf, Schwabacher, Sklar & Epstein and Daniel P. Hays, all of New York City, and Lloyd C. Anderson, of Binghamton, N. Y., on the brief), for plaintiff-appellee.

Harry Polikoff and Guggenheimer & Untermyer, all of New York City, for Instantwhip New York, Inc., as amicus curiae.

Before SWAN, Chief Judge, and CLARK and FRANK, Circuit Judges.

CLARK, Circuit Judge.

It is now no secret that governmental regulation of the distribution of milk is complex and mystifying. Even so, this case appears to set a record of its own. For the question of classification for the purpose of payment of the milk product here in issue, at first blush apparently simple, has baffled even the experts and the trade for several years. The milk product, as manufactured by plaintiff at its Binghamton plant during the period involved, 1943–1948, was a "mix" of whole milk, cream, skimmed milk solids, sugar and a stabilizer, all of which were homogenized. There seems accord, therefore, that in its physical aspects it was an "homogenized mixture." But the question comes as to whether it is to be treated as "in the form of frozen desserts or in the form of homogenized mixtures used in frozen desserts" or even as "cream," to carry the lower rate of payment granted these products in the controlling milk order, or whether it must be paid for as whole milk of the highest grade for want of another and applicable classification. A portion of the product sold by plaintiff was eventually frozen by the purchaser, and payment for that has been assessed and paid at the lower rate. No question is raised as to this. The dispute concerns that portion of the product (the greater amount, in fact) sold to a purchaser who used it in making a product known as "Instant Whip." Instant Whip is made by putting the mix into a patented tubelike container, and adding thereto nitrous oxide gas under pressure. When the valve on the container is opened the product

emerges in a form similar to whipped cream and is ready for immediate use. It is distributed to drug stores, ice cream parlors and similar establishments, and serves the same purposes as whipped cream, including topping on frozen desserts.

So much of the manufacture and distribution of plaintiff's mix product is undisputed. But just how much payment is due from it as handler has been a matter of varying views over the years. After a discussion with an auditor for the Market Administrator, plaintiff reported the mix as cream from 1943 until August, 1945. But for the months of October, 1943, to July, 1945, its reported designation as cream was changed by the Market Administrator to that of "homogenized mixture"—a change which did not affect the amount of the required payments. This new designation and the resulting classification was not questioned, and the payments so made during that period are not in issue here. After a conference with members of the Market Administrator's staff, plaintiff, commencing in August, 1945, reported the mix as "homogenized mixture" in accordance with the previous designation of the Market Administrator. The Market Administrator, as authorized by the Order, issued rules and regulations —temporarily effective August 1, 1945, and made permanent as of November 1, 1945— which contained definitions, *inter alia,* of cream, frozen dessert, and homogenized mixture. In the latter part of 1947, it was discovered that a purchaser was using the product for Instant Whip and not for ice cream or a comparable frozen dessert. So plaintiff's monthly reports were reaudited, this part of the product was reclassified as Class I-A fluid or milk not otherwise classified, and plaintiff was required to pay over $$1,000 additional to the producer-settlement fund.

Thereupon plaintiff sought relief within the agency and a full hearing was had before a Hearing Examiner, who recommended that the classification be changed to that of cream under Class II-A. Both parties filed exceptions, and a hearing of arguments on the full record was had before the Judicial Officer of the Department who (as usual in these cases) was designated to act for the Secretary. The Judicial Officer made lengthy findings and, concluding that the plaintiff was not entitled to relief, dismissed the petition. Plaintiff thereupon sought in the district court below the relief afforded it under the Agricultural Marketing Agreement Act of 1937, 7 U.S.C.A. § 608c(15) (B). In a careful opinion Judge Brennan held the order of the Judicial Officer not in accordance with law and directed defendant and his representatives to classify plaintiff's product as an "homogenized mixture" and to make the resulting refund to the plaintiff. This appeal by the Secretary followed.

Much of the legislative background, the governing statute, and the controlling Milk Order appear not only in Judge Brennan's complete opinion, but also in the many decisions of this court in the field, including the majority and minority opinions in Kass v. Brannan, 2 Cir., 196 F.2d 791, and the opinion in Dairymen's League Cooperative Ass'n v. Brannan, 2 Cir., 173 F.2d 57, certiorari denied 338 U.S. 825, 70 S.Ct. 73, 94 L.Ed. 501. We shall not repeat this material *in extenso* here. The issue of classification comes down essentially to a decision between defendant's contention that ultimate actual use of the product controls and plaintiff's contention that its form as it leaves the handler's plant is decisive. In addition are of course the usual queries as to the extent of our power of review.

This latter question, never easy, has not been rendered less difficult by the Congressional trend toward greater judicial powers of review of agency action, as upheld and interpreted by the Supreme Court in Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. Despite this prodding it would seem that in a field so dependent on supervision by experts, with a milk order not only so complicated, but also so interrelated in all its parts, judicial interference must still be hesitant and cautious. But our doubts as to the extent of our power are somewhat softened by the obvious difficulty the agency officials have found in construing their own order, a difficulty not shown to

be the less by the fact that in 1949, after this controversy arose, the Secretary amended his order to place butterfat as here used in the same classification with butterfat used in frozen desserts. 14 F.R. 7755, and see 7 CFR 927.101 (bb) now defining "whipped topping mixture." Plaintiff, indeed, contends that the Judicial Officer accorded it too limited a hearing in restricting his determination to the issue whether the previous agency action was lawful; it says that, since by the statute it is the Secretary to whom is given the final power of ruling upon a handler's petition for review, 7 U.S.C.A. § 608c(15) (A), he cannot thus be circumscribed in what he may do. We do not feel called upon to pass upon this question, for the power given the courts under id. (15) (B) to determine whether the Secretary's ruling is "in accordance with law" seems to us ample for a final disposition of the case. An order requiring a most substantial additional payment, as here, cannot be considered in accordance with law if it is based upon an unreasonable interpretation of even the Secretary's own order and regulations. Barron Cooperative Creamery v. Wickard, 7 Cir., 140 F.2d 485, 488, per Minton, J. And we believe with the court below that under all the circumstances here disclosed, the reading of the order made in the agency was unreasonable.

■ The Act itself authorizes a classification of the milk in accordance with either "the form in which or the purpose for which it is used." 7 U.S.C.A. § 608c(5) (A). But, as we have had occasion to point out, classification as of the form in which it is held at, or moved from, the plant of the handler where the milk is received from dairy farmers is the basic plan of the order. Queensboro Farm Products v. Wickard, 2 Cir., 137 F.2d 969, 976, 979, 980; Waddington Milk Co. v. Wickard, 2 Cir., 140 F.2d 97, 101; Order 27, 7 CFR 927.4(a) (3). So much is conceded; argument starts because of exceptions which do exist. Plaintiff contends that each one is clearly and explicitly stated and depends upon some perceivable reason, among which geography (or variations made because of the territorial area covered) looms large. It argues, therefore, that in effect the exceptions prove the rule. With the first part of this contention defendant substantially agrees, but he urges that an exception for use is clearly stated here. The classifications which plaintiff claims for its mix are Classes II–D, II–E, and II–F, the significant language of each being that "all milk the butterfat from which leaves or is on hand at a plant * * * in the form of frozen desserts or in the form of homogenized mixtures used in frozen desserts" shall be in one of these classes, depending on the geographical area in which "delivery" is made and also depending on whether the milk product is subsequently moved to or delivered to a "purchaser" in New York City. 7 CFR 1945 Supp. 927.4(c) (7) (8) (9). The accompanying Rules and Regulations also contain the following definition: " 'Homogenized mixture' means the product which results from homogenizing a mixture * * * and which is prepared for use in the manufacture of frozen desserts." 7 CFR 101(x). These are the crucial words to be interpreted.

■ In defendant's view this language amounts to a flat requirement that the product must be more than fitted for or usable as a frozen dessert, but must also always be frozen. This seems to us an unjustified literalism. The provisions appear to emphasize the nature of the product as it "leaves or is on hand at a plant," in perfect accord with the basic standard of the order. The *form* is stressed; that word is repeated many times throughout the categorizations in question, while the *fact* of freezing is nowhere stated forthrightly as a requirement. And the expression "which is prepared for use" is, after all, substantially different from the expression "which is used," which could so easily have been employed, had that been the drafting intent. When this language is viewed in the light of the circumstances, its reference to the form of the product at the plant, rather than its ultimate use in some final purchaser's hand, seems strongly indicated. After all, this was a "mix" of various kinds of milk products which surely ought not to be assessed as of the value of Class

I-A fluid milk, as is now clear from the latest amendments of the order. The Milk Administrator's own ruling to like effect during the period of 1943–1945, while it may not estop the Government, Dairymen's League Cooperative Ass'n v. Brannan, supra, certainly suggests an interpretation which seemed to the parties reasonable at the time. The findings of the Judicial Officer showed also that before August 1, 1945, unfrozen mixtures prepared and used for eggnog and charlotte russe were allowed the homogenized mixture classification by the Market Administrator's Office and that Instant Whip itself had been so classified under New York State Order No. 127 in the Niagara Frontier Milk Marketing Area and had been ruled a "frozen desserts mix" under a New York statute giving the regulation thereof to the Commissioner of Agriculture and Markets, rather than the Health Commissioner. Aerated Products Co. of Buffalo v. Godfrey, 290 N.Y. 92, 48 N.E.2d 275. Finally the obvious administrative difficulties involved in rejecting the simpler test of form at or leaving the handler's plant, making different rates apply to the same product, and requiring a search for ultimate use which (on defendant's line of argument) ought logically to go beyond the Instant Whip distributors to the very consumers themselves, persuade against defendant's interpretation.

Hence, in our view, the construction urged by the plaintiff is a natural and to-be-expected one, while that asserted by defendant is novel and unreasonable. The district court therefore properly sustained plaintiff's claims of review of defendant's order.

Affirmed.

FRANK, Circuit Judge (dissenting).

I am on record as emphatically believing that courts should not rubber-stamp administrative actions.[1] But there are areas of administration as to which judges must humbly acknowledge that they are unusually knowledgeless; in any such area judges should be singularly wary of interfering with the administrative discretion of officials specializing in that area and advised by experts. Vis à vis milk regulation, precisely that has been the previous attitude of this court[2] (and others). I think that unwisely and erroneously my colleagues have here sharply deviated from that attitude. On that account, and because with rather scant explanations they have brushed aside arguments of the Secretary of Agriculture which I think deserve more serious consideration, I am stating at some length my reasons for dissenting.

1. The problem here is entirely one of interpreting a milk order. To illuminate the differing interpretations, I must first briefly summarize the facts.

This milk order No. 27, for the New York metropolitan marketing area, was initially issued in September, 1938, but was changed by extensive amendments, effective August 1, 1945, which, as we recently said in Kass v. Brannan, 2 Cir., 196 F.2d 791, 793, "established a new plan of regulating the marketing of milk in the New York area." The present controversy concerns milk sold after August 1, 1945.

By the terms of the amended order (pertinent portions of which are printed in the Appendix to this opinion), the rate to be paid by handlers for Class I milk is higher than for milk in Classes II–D or II–E or II–F. My colleagues, I think, agree as I do with the Secretary's view that the milk sold by plaintiff, and involved in this suit, was covered by I–A, unless it came within II–D, II–E or II–F. Now each of those three last-named classes includes milk which leaves or is on hand at the handler's plant either (1) "in the form of frozen desserts" or (2) "in the form of homoge-

1. See, e. g., Old Colony Bondholders v. New York, New Haven & Hartford R. Co., 2 Cir., 161 F.2d 413 at pages 449–452, dissenting opinion; Goldman v. American Dealers Service, 2 Cir., 135 F.2d 398; cf. Tobin v. Edward S. Wagner Co., 2 Cir., 187 F.2d 977.

2. Queensboro Farm Products Co. v. Wickard, 2 Cir., 137 F.2d 969; Waddington Milk Co. v. Wickard, 2 Cir., 140 F.2d 97; Wetmiller Dairy & Farm Products Co. v. Wickard, 2 Cir., 149 F.2d 330; Dairymen's League Cooperative Association v. Brannan, 2 Cir., 173 F.2d 57.

nized mixtures *used in frozen desserts"* [3] (provided the mixtures or the frozen desserts produced therefrom are not delivered to a plant or purchaser in certain designated areas and are not marketed in New York City).

The order, before the 1945 amendment, did not require that any regulation be issued officially, defining the terms contained in the order. But the amended order did so require. Accordingly, a regulation issued August 1, 1945, and approved by the Secretary, included this definition: " 'Homogenized mixture' means the product which results from homogenizing a mixture containing milk solids, moisture and sugar (or other sweetening agent) or other ingredients, *and which is prepared for use in the manufacture of frozen desserts."* [3] That definition, be it noted, has two parts:

(1) A statement of ingredients necessary to constitute such a mixture, and

(2) a statement that (to come within the definition) the mixture must also be "prepared for use" in making "frozen desserts."

The milk in question satisfied (1). The sole question is whether it satisfied (2). If not, then the milk came under I-A. The undisputed pertinent facts are these: That milk did not leave plaintiff's plant (nor was it there on hand) in any frozen form. It did leave in the form of a mixture composed of the ingredients required by the definition—*i. e.* what I have labelled part (1). But the mixture was sold and delivered by plaintiff to a purchaser—another handler—who, as plaintiff well knew in advance of the sale and each delivery, never "used (it) in frozen desserts" nor ever had the slightest intention of so using it

or of using it for making anything frozen.[4] For the examiner found from the evidence that plaintiff carefully "prepared" the mixture so that it "would work satisfactorily for" use in "the manufacture of 'Instant Whip.' " [5] And Instant Whip is not a frozen dessert.

Plaintiff contends that the actual use and the actual intended use are utterly irrelevant, and that the words "used in frozen desserts" and "prepared for use in the manufacture of frozen desserts" can reasonably mean this and this only: "suitable for use in making frozen desserts" (or "adaptable" for such use). In short, the plaintiff argues that reasonably those words can relate solely to potential use—as distinguished from the actual use or the actual intended use for which the mixture was "prepared." My colleagues agree with plaintiff's contention.

The Secretary contends that the words may reasonably mean that the homogenized mixture must actually be used, by a subsequent handler,[6] in making a frozen dessert, or that it was sold by the initial handler on the understanding that it would actually be so used. Plaintiff's milk, says the Secretary, was not "used in," intended to be "used in," or "prepared for use in," a frozen dessert, but, as plaintiff knew, was specially "prepared for use" in something else; therefore it came within Class I-A. I agree with the Secretary's contention.

2. My colleagues do not deny the validity of this order if it is correctly interpreted as the Secretary interprets it. For the Act authorizes the Secretary to classify milk according to either (a) "the form in which" the milk is used at or moved from the initial handler's plant, or (b) "the purpose for which it is used" by a subse-

3. Emphasis added.

4. Nor is there any evidence that any subsequent purchaser from plaintiff's purchaser so used it or intended so to use it.

5. The examiner made this unchallenged finding: "The product was prepared for use in the manufacture of 'Instant Whip.' That it was prepared for this purpose is evidenced by testimony of plaintiff's witness Crowley that, before releasing the

product from the plant, the petitioner equipped its laboratory with the type of containers in which it was to be used to see that the product would work satisfactorily in them * * * [The] product was prepared for use and used in the manufacture of 'Instant Whip.' "

6. The words "used in," according to the Secretary's interpretation, have no application except to handlers. See discussion infra.

quent purchaser from the initial handler.[7] With respect to such a "purpose" classification, we said in Queensboro Farm Products v. Wickard, 137 F.2d 969, 976–977: "* * * we take 'purpose' to mean that the handler's use may, in the sole discretion of the Secretary, be determined by reference to the use made by the handler's purchaser or by some subsequent purchaser. * * * [H]e (the Secretary) had unlimited discretion * * * to make any classification whatever on the basis of the 'purpose for which' the milk is used, i. e., its use by someone other than the handler." We were careful to point out in that case how such a "purpose" classification fitted into the over-all plan of the Act,[8] and that the handler's use and not the ultimate consumer's use would be the determinant of price classification. So that—although the basic plan of the order here is to classify milk by the "form" in which it was held at or left the initial handler's plant—it does not invalidate the order if the Secretary's interpretation is correct and the order accordingly contains exceptional provisions establishing a proper "purpose" classification as to homogenized mixtures.

Therefore, the sole issue here is whether the Secretary's interpretation is reasonable; if not, then it did not bind plaintiff, and all other matters my colleagues discuss become irrelevant. If it is reasonable, then it did bind plaintiff, regardless of all those matters, which thus, again, become irrelevant.

3. It may be worthwhile, nevertheless, to clear the air of the plaintiff's estoppel argument (especially as the facts on which it rests are relied on by my colleagues in reaching their interpretation of the order).[9] Let it be assumed that a citizen may properly rely on the informal advice of the Secretary as to the meaning of such an order. Here, however, the Secretary gave no such advice. Therefore it is no defense that the plaintiff relied (if he did) on the Market Administrator's construction of the order. In the Queensboro case, we so held: "Appellant asserts that * * * for many months, the Market Administrator acquiesced in appellant's interpretation of the orders. But even if the uncontradicted evidence so showed, that fact would be irrelevant; nothing in the Act or in the orders confers on the Market Administrator, the Secretary's subordinate, the power to bind the Secretary by his own unauthorized interpretations." 137 F. 2d at 981–982. We specifically adhered to that ruling in two later milk order cases, Wetmiller v. Wickard, 2 Cir., 149 F.2d 330, and Waddington Milk Co. v. Wickard, 2 Cir., 140 F.2d 97.[10] What is more, the record contains no evidence that had plaintiff been advised in advance of the Secretary's present interpretation, plaintiff would have done its business differently. See Dairymen's League Cooperative Association v. Brannan, 2 Cir., 173 F.2d 57, 66.

Furthermore, nothing is in issue here except the proper classification of milk sold by plaintiff from August 1, 1945 through January 1948; and plaintiff, after August 1, 1945 and during the period in question, had no special advice, concerning the proper classification from any official, not even from a subordinate of the Market Administrator. August 1, 1945 is a significant date. For on that date there went into effect,

---

7. See the Appendix to this opinion for excerpts from the Act.

8. See also Dairymen's League Cooperative Association v. Brannan, 2 Cir., 173 F.2d 57.

9. I shall discuss infra their reliance on these facts.

10. This is in line with many Supreme Court rulings rejecting the application, to similar governmental activities, of the doctrines of estoppel and apparent authority. Federal Crop Insurance Corporation v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10; United States v. Stewart, 311 U.S. 60, 61 S.Ct. 102, 85 L.Ed. 40; United States v. San Francisco, 310 U. S. 16, 60 S.Ct. 749, 84 L.Ed. 1050; Wilber National Bank v. United States, 294 U.S. 120, 55 S.Ct. 362, 79 L.Ed. 798; State of Utah v. United States, 284 U.S. 534, 52 S.Ct. 232, 76 L.Ed. 469; Sutton v. United States, 256 U.S. 575, 41 S.Ct. 563, 65 L.Ed. 1099; United States v. Globe Indemnity Co., 2 Cir., 94 F.2d 576, 578, certiorari denied 304 U.S. 575, 58 S.Ct. 1047, 82 L.Ed. 1538. Cf. United States v. California, 332 U.S. 19, 40, 67 S.Ct. 1658, 91 L.Ed. 1889.

in accord with the requirements of the amended order, the published regulations setting forth specific definitions of products. Before August 1, 1945, there had been no published definitions of the divers products named in the order, and no accounting procedure for classifying milk. Until then, the terms had received their definitions only in informal case-to-case determinations by the Administrator or (as here before August 1, 1945) by his subordinates. The formal definitions in the regulation constituted part of a "new plan," as we described it in Kass v. Brannan, 2 Cir., 196 F.2d 791, 793. In the public hearings held by the Market Administrator to discuss the new regulations, while they were still in tentative form, it was announced that they would create new standards superseding earlier informal interpretations.[11]

4. In order to sustain plaintiff's contention, my colleagues have to conclude, as they do, that the Secretary's interpretation, although literally correct, is "unnatural," "novel," "not-to-be-expected," even "arbitrary."[12] But to my mind, his interpretation is entirely sensible.

The dictionary tells us that "used" is the past participle of the verb "to use," which means "to make use of, employ." It also tells us that the word "usable"—not "used"

—is the proper ("natural") term to express mere potentiality of use, i. e., "can be employed or made use of."[13] So that, if the Secretary meant by his order what my colleagues say he meant, he would normally ("naturally") have spoken of "homogenized mixtures usable in frozen desserts." If you ask a housewife for the ingredients "used in" her favorite cake, she will report what she uses, not what she might have used but didn't. And the decisional material shows that the courts have regarded it as a strained and unusual construction to treat "used" as meaning "usable" or "suitable for use."[14]

Indeed, my colleagues at one point acknowledge in effect that "used in" means "actually used in": In discussing the phrase "which is prepared for use," my colleagues say that it cannot reasonably be interpreted as "which is prepared for actual use," since (they assert) had such been the intention, the wording should have been "which is used." That is to say, "used" normally refers to "actual use."

I do not, however, at all agree with my colleagues that "prepared for use," in the definition of "homogenized mixture," does not indicate intended use but merely "suitable for use." For, were my colleagues' construction correct, the words "prepared

11. Plaintiff also complains because before August 1, 1945, the Administrator's office allowed other persons to classify non-frozen dessert ingredients as "homogenized mixture." But in Dairymen's League Cooperative Association v. Brannan, 2 Cir., 173 F.2d 57, 66, we said that as long as the Market Administrator "correctly interpreted his powers" in dealing with the plaintiff, those dealings would not be challenged because of the wayward or vacillating way in which he administered the data generally.

12. See discussion, infra, to the effect that, to sustain the Secretary, it suffices if his interpretation is reasonable, even if other reasonable interpretations are possible.

13. Although "use" as a noun is sometimes used to mean "potential use," "use" as a verb in either infinitive or past participle form is not susceptible to such a "use." See 66 C.J. 65 et seq.

14. See Callison v. State, Tex.Civ.App., 146 S.W.2d 468, 469 (proof of unassembled punch-boards found in defendant's possession did not meet statutory requirement that evidence show devices were being "'used for gaming purposes'"); Southern R. Co. v. City of Richmond, 175 Va. 308, 8 S.E.2d 271, 127 A.L.R. 1368 (Virginia Constitution, § 170, granting municipalities right to levy taxes for "use of sewers" did not authorize tax on "privilege of using sewers whether such sewers be actually used or not," i. e., "'for the use of sewers'" meant actual use not availability for use); Camenzind v. Freeland Furniture Co., 89 Or. 158, 174 P. 139, 147 (statute requiring employer to "use" safety devices violated where machine-guard left detached on floor so as to be merely "available for use" by machine operator); Swalley v. Addressograph Corp., 7 Cir., 158 F.2d 51, 54 (sales contract awarding commissions based on machines shipped into plaintiff's territory "to be used" there did not apply to machines shipped for storage purposes only; they were merely "available for use").

for use" would become superfluous, since it is a fact that every mixture which meets merely the ingredient requirements of the definition is "suitable for use" in making frozen desserts. The words, "prepared for use," added something important, i. e., the controlling factor is the intended actual use and not simply the potential use. In the instant case, the mixture sold by plaintiff was "prepared for use" not in the manufacture of frozen desserts but prepared by plaintiff deliberately for use in the manufacture of an unfrozen product. The phrase "prepared for use" points to the "purpose" of the user; and (as noted above) in the Queensboro Farm Products case, we said that the phrase, found in the Act itself, " 'the purpose for which' it is used", means that, in the Secretary's sole discretion, the use may be determined by reference to the "use" by some subsequent purchaser.[15]

II–F of the order makes peculiarly clear the unreasonableness of my colleagues' "mere potentiality" interpretation. It covers milk "in the form of frozen desserts or in the form of homogenized mixtures used in frozen desserts"; these words are immediately followed by this proviso: "provided that the *frozen desserts, in both instances, were moved to a plant or delivered to a purchaser* outside New York City and remained outside New York City."[16] Plainly the phrase "in both instances" includes mixtures "used in frozen desserts." And, as the classification applies to mixtures used in frozen desserts only when those desserts themselves "were moved" or "delivered," clearly II–F demands actual freezing and necessarily excludes mixtures knowingly prepared (as here) for the manufacture of an unfrozen article. The same is

true of II–D and II–E; for, as plaintiff's brief concedes, the provisions of II–D, II–E and II–F "are identical in intent except as to the geographical areas of disposition." [17]

There was a good practical reason for a "purpose" or "use" exception relative to frozen desserts: In some localities (and notably in New York City), municipal regulations require that actual freezing of frozen products must take place within a stated radius; milk shipped to "country plants" may there be converted into the mixture, but may not there be frozen; instead the mixture must be shipped to a city plant for freezing. The Secretary wanted to give handlers so situated the advantage of the cheaper rates of II–D, II–E and II–F. This he accomplished by providing, in respect of those classes, that homogenized mixtures destined for subsequent freezing should be treated on the same basis as deserts already frozen when they left the handler's plant.

5. My colleagues specify the following items to show the arbitrariness of the Secretary's interpretation:

(a) The Market Administrator, say my colleagues, at one time made a "ruling" in accord with plaintiff's interpretation. My colleagues, calling this an interpretation "by the parties," say that, as it disagrees with the Secretary's interpretation, the latter is presumably unreasonable. But neither the Administrator nor any of his subordinates ever agreed with plaintiff's interpretation after the inauguration on August 1, 1945 of the "new plan" which first set forth a definition of "homogenized mixtures." Moreover, we have several times rejected the contention that views or "rulings," informally expressed by the Administrator, are evidence of a correct interpretation of a milk order.[18]

15. We also said this would not usually include the ultimate consumer.

16. Emphasis added.

17. Moreover, the words "used in" are also contained in another part of the order where they could not, by any stretch of the imagination, mean anything but "actually used." Under 7 C.F.R. 1946 Supp. Sec. 927.9(g), certain rates of adjustment payments were up to 1947 made to handlers depending upon whether butter-

fat in frozen cream "was used" in Classes II–D, II–E, II–F, or IV–A during certain times. There it would be absurd to suggest that "used" meant "adaptable for use in."

18. Queensboro Farm Products v. Wickard, 2 Cir., 137 F.2d 969, 981–982; Wetmiller Dairy & Farm Products Co., Inc. v. Wickard, 2 Cir., 149 F.2d 330; Dairymen's League Cooperative Association v. Brannan, 2 Cir., 173 F.2d 57, 65–66.

(b) The unreasonableness of the Secretary's interpretation appears, say my colleagues, from the fact that in 1949—after the period here in controversy—the Secretary amended the order to put butterfat as used by plaintiff's purchaser in the same classification with butterfat used in frozen desserts. But surely that mere change in 1949 is not evidence of "unreasonableness" in the order as it had stood in the crucial period, which was before 1949: For all we know, the Secretary made this change entirely for policy reasons. See Waddington Milk Co. v. Wickard, 2 Cir., 140 F.2d 97, 100. If my colleagues' reasoning, based on this change, were applied to changes in Treasury Regulations under the income tax law, it would revolutionize decisions in the tax field: Every time the Treasury amended a Regulation, the previous provision (in the unamended Regulation) would become invalid because unreasonable.

(c) Perhaps my colleagues' most remarkable argument is that the Secretary's interpretation would compel a reference to "ultimate use in some final purchaser's hand" and would require "a search for ultimate use which (on defendant's line of argument) ought logically to go * * * to the consumers themselves." I call that argument remarkable because the defendant, the Secretary, has most emphatically disavowed such an interpretation. He has maintained that "used" means used by a handler only; that it is the first conversion by a handler of an homogenized mixture into another product which determines what the mixture was "used in"; and that use thereafter, in some subsequent product manufactured from the mixture, is of no significance.

It may be that the Act forbids the Secretary to make consumers' use a basis of classification;[19] if, then, the Secretary's language did include, *inter alia*, a consumers' use test, to that extent it might be invalid; but plaintiff could not complain of that partial invalidity since it would not affect plaintiff, for the Secretary has classified plaintiff's milk on the basis of its use by the immediate purchaser from plaintiff, and that purchaser is a handler. See the Queensboro Farm Products case, 137 F.2d at pages 977–978.[20] The "search" for "use" was especially easy here, because plaintiff had full knowledge, in advance of the sales, that its purchaser intended not to use the mixture in a frozen dessert.[21]

(d) My colleagues argue further that the Secretary's interpretation is unreasonable in "making different rates apply to the same product." But that result follows from any provision making the rate vary with either the use or the place of delivery,[22] and we have held such a provision valid. Plaintiff's brief so recognizes in saying: "Destination is important because the order in certain instances prices the same product differently for competitive

---

In the Queensboro Farm Products case, 137 F.2d at page 982, note 21, we said that the delegation of power by the Secretary to the Administrator " 'to make rules and regulations to effectuate the terms' " of a milk order do not "include authority to make interpretations of the order in particular instances, relating to particular handlers, such as would bind the Secretary."

19. Cf. Queensboro Farm Products Co. v. Wickard, 2 Cir., 137 F.2d 969, 975; Waddington Milk Co. v. Wickard, 2 Cir., 140 F.2d 97, 101.

20. The plaintiff (appellant) in that case argued that a classification in the milk order was invalid because too broad. After showing that the broad classification included a narrower one which was valid and which alone applied to the

plaintiff, we said, 137 F.2d at pages 977–978: "It follows that those broader aspects of the order need not here be considered. For, so far as appellant is concerned, the issue of their validity is hypothetical. 'Vicarious complaints will not serve.' * * * Consequently, the possible injury to others than appellant which might result from the Secretary's order is a matter we shall not consider."

21. Some "search" after the milk leaves the first handler is necessary under II–D, II–E and II–F, no matter how construed, i. e., a search for the place of delivery.

Note also that II–B classification turns on the cold storage conditions under which the product is stored by the purchaser.

22. See the next preceding footnote.

reasons, depending upon the market into which the product is sold." [23]

(e) My colleagues also rely on Aero Products Co. of Buffalo v. Godfrey, 290 N.Y. 92, 48 N.E.2d 275, interpreting a New York Public Health Law, McK.Consol. Laws, c. 45, as inapplicable to Instant Whip because that product was already being regulated under the New York Agriculture and Markets Law, McK.Consol.Laws, c. 69, as a "frozen dessert mix." That decision ruled only that the burden of complying with the New York Public Health Law would be so onerous in its effect on Instant Whip as to be constitutionally arbitrary and unlawful, considering the small dangers of contamination involved in manufacturing and marketing the product. The case has no applicability whatsoever here; there only the constitutionality and interpretation of a New York Health statute were at stake; no federal price regulatory measures at all were involved. See New York State Guernsey Breeders' Co-op. v. Wickard, 2 Cir., 141 F.2d 805, 810, 153 A. L.R. 1165.

6. I do not see how the Secretary could have made his meaning any clearer. True, he might, perhaps, have put the adverb "actually" in front of "used" in the order and "use" in the regulation. But common sense tells us administrative orders are not written that way. (I am reminded of the old story about the man, ejected from a theatre because of his failure to obey a "No Smoking" sign, who defended himself indignantly on the ground that the sign did not say "Absolutely No Smoking.")

7. I believe (as I've said) that the Secretary's is the only reasonable interpretation.[24] But let us assume that the plaintiff's

is also reasonable. On that assumption, this problem arises: An official empowered by statute to issue an order or regulation, in the course of administering or enforcing it, reasonably interprets it. Is that reasonable interpretation subject to challenge by a person who puts forward a different interpretation which is also reasonable? I think that both authority and common sense call for the answer No. A Yes answer would often yield administrative chaos, since unambiguous language can seldom be found. Often it is all but impossible (and especially so in respect of so complicated a subject as milk regulation) [25] to use words capable of one and only one reasonable meaning. This fact of life should be obvious to legislators when they consider what has happened to their statutes in the courts; it should be still more obvious to judges, who recurrently, and surprisingly, are surprised by the way their words are misunderstood by commentators, and even by other judges. As Corbin recently said:[25a] "It is true that when a judge reads the words of a contract he may jump to the instant and confident opinion that they have but one reasonable meaning and that he knows what it is. A greater familiarity with dictionaries and the usages of words, a better understanding of the uncertainties of language, and a comparative study of more cases in the field of interpretation, will make one beware of holding such an opinion so recklessly arrived at." "It is not true," said Holmes,[26] "that in practice (and I know no reason why theory should disagree with the facts) a given word or even a given collocation of words has one meaning and no other." It follows that an official often cannot avoid issuing an order or regulation free of alternative rational interpretations, although he

---

23. See the discussion, supra, of the good practical reason for a "use" exception relative to frozen desserts.

24. Anomalous results flow from my colleagues' interpretation: Sections I–A through I–C set up special classifications for certain flavored drinks, including eggnog. Yet eggnog meets the ingredient test of the definition of "homogenized mixtures"; and since eggnog is "suitable for use in" the manufacture of eggnog ice cream, it comes, according to my colleagues' interpretation, within

II–D through II–F, which call for lower rates than I–A to I–C. So my colleagues' ruling seriously disturbs the special flavored drink classifications.

25. Queensboro Farm Products v. Wickard, supra; Dairymen's Cooperative League v. Brannan, supra; Wetmiller Dairy & Farm Products Co. v. Wickard, supra.

25a. 3 Corbin, Contracts (1951) 1415.

26. Holmes, Theory of Legal Interpretation, 12 Harv.L.Rev. (1899) 417.

then perceives only one. Consequently, in order to prevent administrative anarchy, the courts should usually accept any reasonable construction of an order by the official who issued that order, despite the existence of another possible rational meaning asserted by the affected citizen. And so our court has held.[27]

8. Barron Co-op. Creamery v. Wickard, 7 Cir., 140 F.2d 485, cited by my colleagues, has no bearing here. In that case (as appears from the fact stated in the footnote [28]), the Secretary's interpretation of a milk order was hopelessly unreasonable.

9. I do not understand why my colleagues, to support their decision, cite Universal Camera Co. v. National Labor R. Board, 340 U.S. 474, 71 S.Ct. 456, 95 L. Ed. 456, since it had to do solely with the scope of judicial review of administrative findings of fact, and here there is no dispute whatever as to such findings.

But the opinion in Universal Camera does interest me here, since it stresses the strict limits on court review of administrative action in so far as such action involves the element of so-called expertise.[29] Particularly in respect of milk orders has our court heretofore underscored that element. Thus in Queensboro Farm Products Co. v. Wickard, 2 Cir., 137 F.2d 969, 974, 980, we said: "Experience * * * has disclosed that the 'milk problem' is exquisitely complicated. The city-dweller or poet who regards the cow as a symbol of bucolic serenity is indeed naive. From the udders of that placid animal flows a bland liquid indispensable to human health but often provoking as much human strife and nastiness as strong alcoohlic beverages * * *. The resultant intricacies * * * have given rise to much legislation and are reflected in many judicial decisions. * * * The milk problem is so vast that fully to comprehend it would require an almost universal knowledge ranging from geology, biology, chemistry and medicine to the niceties of the legislative, judicial and administrative processes of government. It affects an industry immense in scope, for dairying is said to be the largest single branch of agriculture in this country with the exception of that of raising livestock for slaughter, the annual money value of dairy products running to billions of dollars. * * * Considering the complexities of administration * * * and the plain intention of Congress to give the Secretary wide discretion in devising regional milk plans (and the classifications incident thereto), the courts must be slow to intrude on his exercise of that discretion, if for no other reason than that, being inadequately staffed, they are incompetent to undertake the task of constructing and supervising milk marketing programs." [30]

My colleagues in the instant case give lip service to that idea. (They speak of milk regulation as "mystifying.") Yet, without any new first-hand study on their part of the actual workings of this industry and the intricacies of its regulation, my colleagues here blithely tell the Secretary how to exercise his regulatory discretion. In the Queensboro Farm Products case,[31] we noted that there the Secretary had made an ex-

---

27. See, e. g., Grandview Dairy v. Jones, 2 Cir., 157 F.2d 5; Dairymen's League Cooperative Association v. Brannan, 2 Cir., 173 F.2d 57, 66.

28. There a milk order contained the following: " 'Class II milk shall be all milk * * * disposed of in the form of flavored milk and flavored milk drinks, all milk used to produce cottage cheese, and all milk used to produce cream which is disposed of in the form of cream, ice cream, and ice cream mix.' " The Secretary argued that butter sold by the initial handler to a subsequent purchaser, who used it to manufacture ice cream, came under Class II. The court of course held that the wording of the order (i. e., "disposed of") did not require the handler to look beyond his own disposition of the milk or to pursue it to see what ultimately became of it, and if the handler did not dispose of it as ice cream, Class II did not apply. In that case, the Secretary's interpretation was patently erroneous.

29. See 340 U.S. at page 488, 71 S.Ct. 456.

30. See, to the same effect, Waddington Milk Co. v. Wickard, 2 Cir., 140 F.2d 97; New York State Guernsey Breeders' Co-op. v. Wickard, 2 Cir., 141 F.2d 805, 808, 153 A.L.R. 1165.

31. 2 Cir., 137 F.2d 969 at page 980.

ceptional classification because experience had shown that some handlers had manipulated distributions of milk so as to pay lower rates unfairly, and we said: "The Secretary cannot, of course, deviate from the requirements of the statute merely to avoid difficulties of administration or to facilitate enforcement of the Act; but when * * * he exercises his discretion in granting an exception he may properly take that factor into account." But here my colleagues dismantle an important part of a milk order on the ground that they will thereby eliminate "obvious administrative difficulties" which the Secretary failed to take into account. I wonder why my colleagues now feel so sure they know more than the Secretary about such difficulties.[32]

## Appendix

I. Excerpt from the Agriculture Marketing Agreement Act of 1937, 50 Stat. 246, amending the Agricultural Adjustment Act of 1933, 48 Stat. 31, as amended, 7 U.S.C.A. § 601 et seq.:

"Terms—Milk and Its Products

"(5) In the case of milk and its products, orders issued pursuant to this section shall contain one or more of the following terms and conditions, and (except as provided in subsection (7)) no others: (A) Classifying milk in accordance with the form in which or the purpose for which it is used, and fixing, or providing a method for fixing, minimum prices for each such use classification which all handlers shall pay, and the time when payments shall be made, for milk purchased from producers or associations of producers. Such prices shall be uniform as to all handlers, subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the

grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers. * * *" 7 U.S.C.A. § 608c(5) (A).

II. The following are excerpts from the New York Milk order, as amended, effective August 1, 1945 (7 F.R. 2370; 8 F.R. 6327; 10 F.R. 6156):

"Sec. 927.4 Classification. (a) Basis of classification. All milk, the classification of which is necessary to establish the classification of milk received from producers, and all milk entering the marketing area as milk, skim milk, cultured or flavored milk drinks, cream, or plain condensed milk, shall be classified in accordance with the form in which it is held at, or moved from the plant at which classification is determined. Such classification shall be subject to the following conditions: (1) *Burden of proof.* In establishing the classification of milk received from producers the burden rests upon the handler who received such milk from producers to show that such milk should not be classified as Class I–A, and having established the manufacture of cream, the burden rests upon such handler to show that the milk the butterfat from which was manufactured into cream should not be classified as Class II–A, and that the skim milk resulting from the manufacture of cream, should not be classified as Class V–A. The burden rests upon the handler who receives or distributes in the marketing area, milk, skim milk, cultured or flavored milk drinks, cream, or plain condensed milk, to establish the source of all of his milk or milk products. * * *

"(3) *Plant at which classification is to be determined.* Classification shall be determined at the plant where the

---

32. A wag, noting my colleagues' attitude towards the Secretary's language about frozen products, might recall Rabelais' comments on Aristophanes' comparison of Plato's philosophy with "words spoken in some arctic country, during a hard winter: No sooner spoken, they froze up and congealed in the chill air, without ever being heard." Rabelais' characters came upon such frozen words: When thawed, "We could clearly hear them but we did not understand them, for they were in a barbaric idiom." Rabelais, Gargantua and Pantagruel (Modern Library ed. 1944, transl. by Le Clercq) Book Four, Chs. 55–56.

milk is received from dairy farmers: *Provided,* That, if such milk is shipped in the form of milk, skim milk, cream, or plain condensed milk to another plant or other plants, it shall be classified, subject to the provisions of (i) through (vi) of this subparagraph, at the plant or plants to which it is shipped, and there shall be no limit on the number of interplant movements in the form of milk, skim milk, cream, or plain condensed milk prior to classification, except as set forth in (i) through (vi) of this subparagraph.

"(i) If the shipment is to a plant in the marketing area, milk shipped in the form of milk shall be classified as Class I–A; milk the butterfat from which is shipped in the form of cream shall be classified as Class II–A, and in the form of plain condensed milk leaves the plant where first received in the marketing area in the form of frozen desserts or homogenized mixtures in which case the milk shall be classified in the appropriate class or classes for milk utilized in frozen desserts or homogenized mixtures; and skim milk shipped in the form of skim milk shall be classified as Class V–A. * * *

"(5). *Accounting procedure.* The accounting procedure for classifying milk pursuant to this section, including the conversion factors to be used in the absence of specific weights and tests, and the specific definitions of products included in each class, shall be set up by the market administrator pursuant to (b) of this section. Such accounting procedure shall be in accordance with the following general principles. * * * (c) *Classes of utilization.* Subject to all of the conditions set forth in (a) and (b) of this section, the classes of milk shall be as follows:

"(1) Class I–A milk shall be all milk, except as provided in (2) and (3) of this paragraph, which leaves a plant as milk, or cultured or flavored milk drinks containing 3.0 percent butterfat or more, and all the milk the classification of which is not established in some other class named in this paragraph.

"(2) Class I–B milk shall be all milk which leaves a plant as milk, or cultured or flavored milk drinks containing 3.0 percent butterfat or more, which has not passed through the marketing area, but which is ultimately distributed in an area regulated by another order of the Secretary.

"(3) Class I–C milk shall be all milk which leaves a plant as milk, or cultured or flavored milk drinks containing 3.0 percent butterfat or more which has not passed through the marketing area, but including milk which was received directly from producers at a plant in the marketing area, and which is ultimately distributed in an area not regulated by an order of the Secretary.

"(4) Class II–A milk shall be all milk the butterfat from which leaves or is on hand at a plant in the form of cultured or flavored milk drinks containing less than 3.0 percent butterfat or in the form of cream, sweet, or sour, unless such cream is established to have been subsequently so handled or marketed as to classify such milk in some other class.

"(5) Class II–B milk shall be all milk, except as set forth in (7) (8) and (9) of this paragraph, the butterfat from which leaves or is on hand at a plant in the form of plain condensed milk, frozen desserts or homogenized mixtures; or which leaves or is on hand at a plant in the form of cream which is subsequently held in a licensed cold storage warehouse at an average temperature below zero degrees Fahrenheit for 7 consecutive days and below 15 degrees Fahrenheit for at least 21 days thereafter, as shown by charts of a recording thermometer, and which is subject at all times to being inspected by a representative of the market administrator to determine the physical presence of the cream and the temperature of the room where stored. After the first 7 consecutive days such cream may be moved from one licensed cold storage warehouse to another: *Provided,* That the market administrator re-

ceives notice of such removal within 48 hours thereafter. Any handler whose report claimed the original classification of milk in this class shall be liable under the provisions of Sec. 927.8(j) for the difference between the Class II–B and Class II–A prices for the month in which the II–B classification was claimed on any such milk, if the storage of the cream does not comply with all the requirements of this subparagraph.

"(6) Class II–C milk shall be all milk the butterfat from which leaves or is on hand at a plant in the form of cream which is delivered to a plant or a purchaser in the special cream area, is not moved as cream to a plant in the marketing area or delivered to a purchaser in the marketing area, and the classification of which is not established in some other class.

"(7) Class II–D milk shall be all milk the butterfat from which leaves or is on hand at a plant in the form of cream or in the form of plain condensed milk or in the form of frozen desserts or in the form of homogenized mixtures used in frozen desserts which is delivered to a plant or a purchaser outside the marketing area, outside the special cream area and outside New England: *Provided,* That the cream or the plain condensed milk is not moved to a plant in the marketing area, in the special cream area, or in New England, or delivered to a purchaser in the marketing area, in the special cream area, or in New England: *Provided, further,* That the frozen desserts or the homogenized mixtures used in frozen desserts are not moved to a plant in New York City, or delivered to a purchaser in New York City.

"(8) Class II–E milk shall be all milk the butterfat from which leaves or is on hand at a plant in the form of cream or in the form of plain condensed milk or in the form of frozen desserts or in the form of homogenized mixtures used in frozen desserts, which is delivered to a plant or a purchaser in New England: *Provided,* That the cream or the plain condensed milk is not moved to a plant outside New England or delivered to a purchaser outside New England: *Provided, further,* That the frozen desserts or homogenized mixtures used in frozen desserts are not moved to a plant in New York City or delivered to a purchaser in New York City.

"(9) Class II–F milk shall be all milk the butterfat from which leaves or is on hand at a plant in the form of plain condensed milk which is delivered to a plant or a purchaser in the special cream area, is not moved as plain condensed milk to a plant in the marketing area or delivered to a purchaser in the marketing area, and the classification of which is not established in some other class; or all milk the butterfat from which leaves or is on hand at a plant in the form of frozen desserts or in the form of homogenized mixtures used in frozen desserts, except as set forth in the subparagraphs (7) and (8) of this paragraph, provided the frozen desserts in both instances were moved to a plant or delivered to a purchaser outside New York City and remained outside New York City; or all milk the butterfat from which leaves or is on hand at a plant in the form of cream cheese. * * *"

The following are excerpts from the Rules and Regulations issued under the foregoing New York Order and effective August 1, 1945:

"7 C.F.R. Sec. 101(w): 'Frozen desserts' means those products commonly known as ice cream, frozen custard, sherbet, and frozen confections such as, but not restricted to, Bisque Tortoni, Spumoni, creamsicles, fudgicles, popsicles, mousses, parfaits, puddings (such as Nesselrode puddings), and decorations for the frozen desserts, but not including products properly known as candy.

"7 C.F.R. Sec. 101(x): 'Homogenized mixture' means the product which results from homogenizing a mixture containing milk solids, moisture, and sugar (or other sweetening agent) or

other ingredients, and which is prepared for use in the manufacture of frozen desserts. It shall contain not less than 5 per cent sugar (or other sweetening agent) or other ingredients, and not less than 5 per cent moisture."